AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
| v. | ) |
| | ) Case No. 21-6149-Hunt |
| CINDI ELLIS DENTON | ) |
| | ) |
| | ) |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of June 1, 2020 - September 30, 2020 in the county of Broward in the Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 and 2 | Wire fraud |
| 18 U.S.C. §§ 1344 and 2 | Bank fraud |
| 18 U.S.C. § 1349 | Conspiracy/attempt to commit wire fraud/bank fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

SA Sarah Conlon, IRS-CI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by    telephone

Date: 3/16/2021

*Judge's signature*

City and state: Fort Lauderdale, Florida      Hon. Patrick M. Hunt, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Sarah Conlon, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I make this Affidavit in support of a criminal complaint charging CINDI ELLIS DENTON ("DENTON" or "Defendant"), with wire fraud, bank fraud, and attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349, and 2, from on or about June 1, 2020, to at least on or about September 30, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2.  Defendant has participated in a conspiracy and scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs. Defendant committed the Target Offenses with a person now cooperating with the investigation ("CHS 2") and others. Defendant obtained a fraudulent PPP loan for her own company, Emerald Jade Solutions, Inc. ("Emerald Jade"), with CHS 2 providing falsified documents and submitting the application on Defendant's behalf in exchange for a kickback from the loan proceeds. To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms. For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies, with minor changes.

3.  The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted. Based on the evidence investigators have reviewed to date, CHS 2, Defendant, and their co-conspirators applied for PPP loans that are together worth more than $34 million, with at least approximately 42 of those loans approved and funded for a

total of approximately $17.6 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4. I am a Special Agent with the United States Department of the Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since November 2018. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in March 2019 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in June 2019. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.

This Affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

7. In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (Small Business Administration ("SBA") Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

---

[1] The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere. As a result, not all numbered sources and anonymous individuals and entities are described in every filing. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

8. A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

9. PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

## *Financial Institutions*

10. This Affidavit references financial institutions that are headquartered in the United States and insured by the Federal Deposit Insurance Corporation, including Bank 1, Bank 3, Bank 5, Bank 6, and Bank 7.

## *The Scheme to Obtain Fraudulent PPP Loans*

11. On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin. Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1"). The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.

12. Following the success of that initial fraudulent PPP application, Augustin and CHS 2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million.

13. On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences. Following their arrests, CHS 2 and CHS 3 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with their pending charges. CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel. CHS 3 has also been interviewed numerous times and has continued to cooperate with the investigation after obtaining counsel. Most of the statements related herein have been corroborated by records obtained from third parties or recovered from CHS 2's and CHS 3's respective electronic devices.

14. Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $34 million dollars. The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest. The evidence suggests that all or nearly all of those loan applications were fraudulent, including Defendant's loan application.

15. Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others. These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank

statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[2] CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form. He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount. In turn, the number of employees reported was chosen based on fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

16.     CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance. Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements. In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7. In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

17.     A review of records for bank accounts controlled by CHS 2 at Bank 5 confirmed CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme. CHS 2 explained that they were doing so many loans by the end of May that

---

[2]     Some loan applications also included voided checks that appear to be falsified, such as a purported check from a bank ("Bank 5") that appears to have been produced on a computer and, as the subject line of an email transmitting the voided check read, "Converted to PDF[,]" rather than a scan of an authentic check.

he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

18.   Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of August 31, 2020, investigators had identified a total of approximately $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

19.   The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme. In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity. The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees[,]" "Monthly Payroll Expense[,]" and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

20.   Data obtained from the SBA showed additional PPP loan applications from additional entities that text message and email records show had been referred to CHS 2 by members of the conspiracy.

21.   According to CHS 3, he met DENTON through unrelated business ventures in early 2020. CHS 3 subsequently contacted DENTON regarding the PPP conspiracy described above.

### *The Fraudulent PPP Loan Disbursed to DENTON's Company: Emerald Jade Solutions, Inc.*

22.     According to California's Secretary of State website, Emerald Jade was established as a California corporation on or about December 11, 2013. DENTON is listed as the company's Chief Financial Officer and Director. Emerald Jade has not made any filings with the California Secretary of State since 2019 and its status is listed as "Suspended" on California's Secretary of State website. The mailing address of Emerald Jade included on California's Corporations Division website is the same address that appeared on DENTON's California Department of Motor Vehicles records at the time DENTON submitted, or caused the submission of, the PPP loan application for Emerald Jade.[3]

23.     On or about June 1, 2020, DENTON sent CHS 3 a completed version of the "intake form" from DENTON's email address of "cindi@emeraldjadesolutions.com." Under the Personal Information heading, DENTON included her social security number and date of birth, and DENTON used the email address "cindi@emeraldjadesolutions.com" and the phone number 949-633-2618 (DENTON also used both this email address and this phone number to communicate with CHS 3 in connection with the fraudulent PPP loan for Emerald Jade).

24.     On or about June 2, 2020, a PPP loan application package on behalf of Emerald Jade was electronically submitted to Bank 3 through Bank Processor 1. Internet protocol ("IP") session records from Bank Processor 1 for the loan application show that a computer with an IP address (ending in 170) associated with CHS 2's residence in Broward County, Florida, logged into the Emerald Jade loan account on or about June 2, 2020. The session records also reveal four additional logins by the same IP address (ending in 170) on the same day, and two logins on or

---

[3]     DENTON updated her records with the California Department of Motor Vehicles in August 2020; the updated address on DENTON's Department of Motor Vehicles record is the address in which DENTON currently resides in Eastvale, California.

about June 3, 2020 by a computer with an IP address (ending in 152) associated with DENTON's residence. The session records show three additional logins by the IP address (ending in 152) associated with DENTON's residence. Records for DENTON's account at Bank 7 show that DENTON also used the IP address ending in 152 to access DENTON's account online and conduct online transfers.

25. The loan application package included, among other documents: (1) four purported Forms 941 for each quarter of 2019 in the name of Emerald Jade; (2) a purported company bank statement for Emerald Jade from Bank 7; and (3) a Borrower Application Form for a PPP loan request of $491,310 for Emerald Jade based upon a purported average monthly payroll of $196,524 for 24 employees (the "PPP Application Form").

26. The purported Forms 941 submitted with Emerald Jade's PPP loan application package show quarterly payroll of over $589,574.04 each quarter, for 24 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $196,524, which determined the $491,310 amount of the loan. Each Form 941 was signed by hand with the name "Cindi Denton" as the company owner, and also listed "Cindi Denton" as the company's designee and as a "Paid Preparer," although DENTON is not a paid tax preparer.[4]

27. The purported Forms 941 submitted with Emerald Jade's PPP loan application package follow the same style and pattern, including the indicia of fraud, as the many other Forms 941 that CHS 2 acknowledged that he helped create and submit in the course of the scheme, as

---

[4] CHS 2 admitted during interviews with law enforcement that CHS 2 signed many of the Forms 941 included in the PPP applications. The signature on Emerald Jade's Forms 941 included with its PPP applications resembles a signature that CHS 2 identified as one that CHS 2 forged.

described above.[5] The purported Forms 941 included the contact information and identifiers that DENTON had included on the "intake form" that DENTON emailed to CHS 3.

28. Moreover, IRS records show that Emerald Jade did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020. Likewise, State of California Labor and Workforce Development Agency records demonstrate that Emerald Jade has not filed to withhold California employment taxes for 2018, 2019, or Quarters 1 and 2 of 2020.

29. The purported company bank statement for Emerald Jade submitted with its PPP loan application package, which was submitted in electronic format as a PDF, is a clear forgery. First, it purports to be a February 2020 bank statement from Bank 7; however, based upon bank records from Bank 7, the statement for the actual Emerald Jade Bank 7 account is dissimilar from the PDF statement attached to the PPP application. Second, according to the PDF file "properties," the February 2020 statement was created using "PDFFILLER," a program used to edit electronic PDF files, and was "modified using iText." The metadata shows the file was created on or about May 30, 2020 and modified on or about June 2, 2020. Third, the statement is a recycled version

---

[5] As noted above, DENTON was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared the Forms 941 at issue. The content of the forms also indicate falsification. Emerald Jade submitted four identical 941s—the forms include wage figures that are identical down to the penny in reported figures). They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

of the same falsified Bank 7 statement used in other fraudulent applications submitted as part of this scheme.

30. The PPP Application Form required the borrower to electronically initial and/or sign (via DocuSign, as explained below) a number of "certifications," including: (1) that the applicant business was in operation on February 15, 2020 and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility payments as specified by the PPP rule and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges.

31. Based on the false and fraudulent representations made in the PPP Application Form and supporting documents, Bank Processor 1 approved the PPP loan application for Emerald Jade. As explained in greater detail below, Bank 3 wired approximately $491,310 in loan proceeds to Emerald Jade on or about June 3, 2020.

***Records Show that DENTON Viewed and Signed the PPP Application Form***

32. In connection with this investigation, law enforcement obtained records from DocuSign pursuant to 18 U.S.C. § 2703(d). Based on a review of the records, law enforcement believes DENTON signed the PPP application for Emerald Jade using DocuSign.

33. Specifically, the DocuSign records show that, on June 2, 2020, at 9:42:25 a.m., Bank Processor 1 sent the PPP Application Form to the DocuSign user "Cindi Denton" at the email address "cindi@emeraldjadesolutions.com."[6] As mentioned above, DENTON used the email

---

[6] Based on information provided by CHS 3, the application was created by CHS 2.

address "cindi@emeraldjadesolutions.com" to communicate with CHS 3 in connection with the fraudulent PPP loan for Emerald Jade.

34. Based upon these records from DocuSign, it is reasonable to infer that DENTON viewed the PPP Application Form on or about June 2, 2020 at 9:42:43 a.m., and DENTON signed the PPP Application Form on or about June 2, 2020 at 9:43:33 a.m.

## *Records Confirm DENTON's Receipt of the PPP Loan and Further Demonstrate DENTON's Knowing Participation in the Fraud*

35. As part of its investigation, law enforcement obtained bank records as well as communications between CHS 3 and DENTON, including text messages and emails provided by CHS 3 to law enforcement.

36. Bank records show that Emerald Jade had an account at Bank 7 ending in *7366 ("Bank 7 *7366"). Customer information for the Bank 7 *7366 account shows that DENTON was the sole signatory on the account and identifies DENTON's title as "Secretary." Based on my review, the signature on this account appears to match the signature on the PPP loan application.

37. On or about June 2, 2020, CHS 3 sent a text message reminding DENTON to check her email and DENTON responded, "Will do. Thank you." Later that day, from the cindi@emeraldjadesolutions.com account, DENTON forwarded an email to CHS 3 with the subject, "Your PPP funds are on the way."

38. The next day, the Bank 7 *7366 account received via bank wire approximately $491,310 in loan proceeds from Bank 3 as a result of Emerald Jade's fraudulent PPP loan application.

39. On or about June 4, 2020, DENTON wired an approximately $98,262 kickback payment, which equaled approximately 20 percent of the proceeds of Emerald Jade's PPP loan, from the Bank 7 *7366 account to an account at Bank 7 controlled by CHS 3. Two weeks later,

on or about June 16, 2020, DENTON sent CHS 3 an invoice purporting to show that Emerald Jade owed CHS 3 $98,000 for consulting services. CHS 3 has told law enforcement that DENTON told him he needed to sign the document and that he recognizes the number as the kickback payment that DENTON made to him for the loan.

40. Based on my review of the bank records discussed above, DENTON has spent a significant amount of the remaining PPP loan proceeds. Between on or about June 4, 2020 and on or about June 26, 2020, in addition to the wire to CHS 3, DENTON sent additional wires totaling approximately $175,860, including a $150,000 wire to a personal checking account at Bank 7 ending in 6999. Moreover, it does not appear that any of the proceeds of the PPP loan were used for legitimate business expenses or payroll related expenditures to any employee other than DENTON herself.

41. Law enforcement observed video surveillance from Bank 7 that shows DENTON conducting cash withdrawals at a Bank 7 location on or about June 4, 2020 and June 8, 2020. The cash withdrawals were each in the amount of $9,900.

***A Recorded Call with CHS 3 Confirms DENTON's Knowing Participation in the Fraud***

42. As part of the investigation, and at law enforcement's direction, CHS 3 placed a controlled call to DENTON on or about July 2, 2020, by calling the number he had previously used to text message with DENTON. During the call, DENTON said that DENTON used the PPP loan funds to pay "bills," including "credit cards and cars and rents and all that kind of stuff." CHS 3 asked DENTON how many employees were included on Emerald Jade's PPP application. DENTON stated, "We only have one paid employee." CHS 3 responded, "I understand that but you know that we bullshitted and said you had, like, 20, so you gotta help me here." DENTON replied, "Oh, God . . . I don't know how to do that, I don't know what you want me to do."

DENTON did not express surprise or confusion that the Emerald Jade application included more than one employee. CHS 3 asked DENTON if she wanted more money, to which DENTON responded, "We could always use more money, yeah." CHS 3 then explained, "If I say you had 24 employees, you get 400, if I say you have 30 you can get up to 500. What do you want me to do?" DENTON initially replied, "Just 20." CHS 3 explained that he had said 24 and that 20 was not an option. DENTON responded that DENTON was okay with CHS 3 claiming that DENTON had 24 employees.

## CONCLUSION

43. Based on the forgoing, I respectfully submit that there is probable cause to believe that CINDI ELLIS DENTON committed the Target Offenses, from on or about June 1, 2020, to at least on or about September 30, 2020, in the Southern District of Florida, and elsewhere.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

*Sarah Conlon* (signature)
Sarah Conlon
Special Agent
IRS-CI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ~~FaceTime~~ Telephone, on this 16th day of March, 2021, at Fort Lauderdale, FL

(signature)
HONORABLE PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE